Green, J.
The first question demanding the consideration of the court in this case, is, as- to the effect the registry of a name for a reservation, is to have under the treaties of 1817 and 1819, between the United States and the Cherokee Indians. On the part of the lessor of the plaintiff, it is contended, that the registry of a name for a reservation is conclusive evidence that the party was the head of an Indian family, and resided on the ceded land east of the Mississippi, and was thereby entitled under these treaties to a reservation. On part of the defendant, it is contended, that such registry is evidence of no one fact necessary to be shown in order to consti *325 tute a title to a reservation; but that all the facts must be proven by the evidence. In order to a proper understanding of this question, we must examine several provisions of the treaty of 1817. By the first and second articles of this treaty, the Cherokee nation cede to the United States a large tract of country then in their possession. By the fifth article of this treaty, the “United States bind themselves, in exchange for the lands ceded in the first and second articles hereof, to give to that part of the Cherokee nation on the Arkansaw, as much land on said river, and on White river, as they have, or may hereafter receive from the Cherokee nation east of the Mississippi, acre for acre, as the just proportion due that part of the nation on the Arkansaw, agreeably to their numbers.” The eighth article of the treaty provides, that each head of an Indian family residing on the ceded land east of the Mississippi, who may desire to become citizens of the United States, may have a reservation of 640 acres, to include their improvement in a square, for life, with a reversion in fee to their children, the register of whose names is to be filed in the office of the Cherokee agent, which shall be kept open until the census is taken as stipulated in the third article of the treaty. Provided, that if the reservee remove from the land, his right to be forfeited, and revert to the United States; “and provided, further, that the land which may be received under this article, be deducted from the amount which has been ceded under the first and second articles of this treaty.” The second article of the treaty of 1819, stipulates to allow a reservation of 640 acres to each head of an Indian family residing within the ceded territory, those enrolled for the Arkansaw excepted, who choose to become citizens of the United States, in the manner stipulated in the treaty of 1817. It will be seen by this review of these treaties, that the land ceded was to be paid for by the United States, inland on the Arkansaw and White rivers, acre for acre, and that the reservations which might be *326 taken, were to be deducted from the quantity ceded; and thereby, by the whole quantity thus reserved, reduce the quantity the United States would be compelled to give in exchange. The register of the names of those intend* ing to take reservations, was indispensable, in order that the parties to the treaty might he able to know how much land to deduct from the quantity ceded, so as to show the quantity for which the United States was liable to pay, when all the reservations of those whose names were registered were thus deducted, and the United States, in execution of this part of the treaty, made payment for the balance, they were forever discharged from any further liability, and the right to a reservation within the ceded territory, became absolute in all those whose names were thus registered. There could be no party to question this right. The contracting parties to the treaties have both admitted it: the United States by demanding and receiving a credit for as many 640 acre tracts as there were names registered, and the Cherokee nation by admitting this demand, and making the deduction. A majority of the court, therefore, think that the fact that a party’s name was registered with the Cherokee agent, for a reservation, within the time prescribed in the treaties, is conclusive evidence that such party was the head of an Indian family, and resided within the ceded territory. The only remaining question to be noticed is, whether the circuit court erred in telling the jury in substance, that although the lessor of the plaintiff might have been expelled from his reservation by force, if the defendants were not concerned in such expulsion, the lessor of the plaintiff could not recover against them. In this direction, we are all of opinion that the circuit court erred. The treaty vests an absolute right for life to the land reserved, subject to be divested only by his “removal therefrom.” This removal, to work a forfeiture, must be voluntary. If the lessor of the plaintiff was expelled by force, his title was not forfeited by such removal; and if not forfeit *327 ed by him, the defendant, though not concerned in his expulsion, could not acquire a title to the land from which the lessor of the plaintiff was expelled. The judgment must be reversed, and the cause remanded to the circuit court, for a new trial to he had therein, upon the principles assumed in this opinion.
Whyte, J. concurred with Judge Green.
Peck, J.
The opinion I delivered at Knoxville, July 1830, in Blair and Johnson vs. Pathkiller, has a direct hearing upon the principal points presented in this case. I was surprised to find in the report of the case of Path-killer, that opinion omitted. In making this remark, I am not to be understood as attaching blame to the Reporter, being confident the omission was unintentional. Having since, at this place, recovered the opinion, (through the columns of the “Recorder,”) I take occasion to append it to this case, in the form it was delivered. While it is offered to sustain this judgment, it may also be referred to its proper place, in 2 Yerger’s Reports, 407.
Blair and Johnson vs. Pathkiller.
By the treaty of 1817, article 8, it is stipulated, “And to each and every head of an Indian family residing on the east side of the Mississippi river, on the lands that are now, or may hereafter be, surrendered to the United States, who may wish to become citizens of the United States, the United States do agree to give a reservation of ' six hundred and forty acres of land, in a square, to include their improvements, which are to be as near the centre thereof as practicable, the register of whose names is to be filed in the office of the Cherokee agent, which shall be kept open until the census is taken, as stipulated in the third article.” By the treaty of 1S19, article 2, “ The United States agree to pay, according to the stipulations contained in the treaty of the eighth of July *328 1817, for all improvements on land lying within the country ceded by the Cherokees, which add real value to the land; and do agree to allow a reservation of six hundred and forty acres to each head of an Indian family residing within the ceded territory, those enrolled for the Arkansas excepted, who choose to become citizens of the United States in the manner stipulated in said treaty.” In article third, is a stipulation in favour of specified individual Indians, of six hundred and forty acres, to include their improvements as nearly in the centre as possible; “all of whom are believed to be persons of industry, and capable of managing their property with discretion, and have, with few exceptions, made considerable improvements on the tracts reserved.” In the next paragraph, follows a location of each of the tracts, so special that the lands cannot be mistaken. These are fee simple reserves. Those specified under the other articles, are life estate reserves, to the head of the family, in fee, to his or her children, and to the widow, dower. Several questions on the construction of these treaties have been made; some of which, important to the determination of this case, it will be my business to consider. First: Is it indispensable that an Indian taking a reserve, should necessarily include an improvement, and in default of his possessing one to include, shall his claim to a 640 acre reservation, at a place'by him selected in his enrolment with the agent, for that cause become forfeited? A sound construction of these treaties must determine this question. What, I would ask, was the view of the contracting parties at the time of framing these stipulations? We know it had long been the expressed desire of the government of the United States, that the Indian should cultivate the arts of civilization, bring himself under the protection of our laws, and thereby become citizens of the United States. To attain this end, long before making this treaty, the United States had contributed the labor of agents in various departments, and had exhausted much *329 treasure. The cause had been .applauded, for the humane spirit displayed; but above all, for that justice, temperance, and magnanimity, which treated these people rather as children than as an independent nation. The known inferiority of the Indian’s capacity to negociate, even if we put out of the way considerations of a broken down and conquered spirit, might incline the jurist to look astutely into the rights of him the most likely to be overreached, and to guard those rights in some proportion, as the arts of the civilized man might be found to surpass those of the uncivilized.
The intention, on the part of the United States, to hold out inducements to the Indians to become citizens, is manifest from the face of the treaty. Two parties had arisen in the Cherokee nation. The one was desirous of removing west of the Mississippi; the other wished to remain and become “subject to fixed laws and regular government.” The President, in answer to the petitions of both parties, says, “The United States, my children, are the friends of both parties, and, as far as can be reasonably asked, they are willing to satisfy the wishes of both. Those who remain, may be assured of our patronage, our aid, and good neighborhood,” &c. See preamble to the treaty, of 1817.
Keeping in view this promise, on the part of the United States, the eighth article was inserted; and which article holds out to each and every head of an Indian family, residing east of the Mississippi, on the lands that are now, or may hereafter be, surrendered to the United States, who may wish to become a citizen of the United States, the prospect of a reservation of six hundred and forty acres of land, in a square, to include their improvements, in which they shall have a life estate, &c. What terms have we in this clause which designate the person intended to be provided for? “Head of an Indian family,residing east of the Mississippi, on lands that are now, or may hereafter be surrendered, wishing to become a citizen of the *330 United States.” To such a person the reservation is given. The balance of the clause, “including his improvements,” is descriptive of the property granted. See eighth ar-tide.
The treaty fixes no limitation as to the number of those ■ who rnight wish to become citizens, hut, on the contrary, holds out the inducement to each and every head of a family. The last proviso to the article in question, aids in this construction; “provided that the land which may he reserved under this article, he deducted from the amount which has been ceded under the first and second articles.of this treaty;” which proviso has direct relation to the quantity to he set apart on the Arkansas. See article fifth, of the treaty of 1817. To come at a proper construction, the state of things as they existed at the time of the treaty, may be resorted to. Vat. Book 2, ch. 17, sec. 280-1 — 2-3-4, &c. All the heads of Indian families did nor have improvements; much the greatest number living in towns or villages, had improvements in common; some, no doubt, had no improvements. How, under such a state of things, can it be pretended that each and every head of an “Indian family” could have a reserve, if he must bring himself under the description of one having an improvement, which must be included in the centre of his survey? This is violating all the rules of construction; it is making the minor control the major; it destroys equality amongst those intended to be provided for, because where many had an improvement in common, none could be satisfied, since all could not include the improvement in the centre of the survey for each. That construction shall prevail which produces equality, (sec. 301,) that shall not, which produces penalty or forfeiture. See same book, sec. 303. It was not the intention to limit the number of reserves, for fear the United States might be defrauded. Provision is made against that, by the exchange, “acre for acre;” and besides, the United States had her own agent, to see to and *331 guard her interest. We are hound to presume that the agent acted under instructions irom the proper department; and so long as the United States do not call his acts in question, shall we do it for the United States? Again: the act of surveying the land at the place the head of this family chose to specify, and that before the land sales under which Blair claims, is an act on the part of the United States confirmatory of the acts of the agent, arid which, in my humble conception, we have no right to disturb. I assume it, therefore, as a point proved, that the clause to include his improvement in the centre, was inserted for the benefit of the head of an Indian family, and that being inserted for his benefit, he had a right to abandon it and have a reserve at another place. A natural presumption is, that an Indian having an improvement would, as he had the choice of the country, select a favorable spot, and one not likely to be abandoned. Still, upon a legal principle not to be questioned, he had a right to abandon what was for his benefit, and hold on to a specified tract. In doing this, he gets hut his six hundred and forty acres, and the State takes the six hundred and forty acres at the place where this improvement had been made. The State, as to quantity, loses nothing; and why, where fraud is not imputed, should it become a matter of such serious import that an entire forfeiture should be the consequence? I hold the law not to be so; for between citizen and citizen, every intendment and reasonable construction will be given in support of a grant, rather than that it should perish or be defeated, and to this we have many adjudicated cases. But take these two treaties in connexion, and construe them as one, and additional reasons can he urged why such should be the construction in support of the reserve. I have already shown that a construction to produce equality of rights should he preferred. In this treaty we find reserves given in fee simple, and the quantity and spot fixed. The reason is given in the treaty, “all of whom *332 are believed to be persons of industry, and capable of managing their property with discretion.” To the other class, the estate is only for life, with a remainder, &c. and the only cause of forfeiture fixed in the treaty, is abandonment of the .reserve, after it is allowed. One rule of construction given by Vattel, 406, is decisive of this-point. Sec. 310. “Liberal promises, benefits, and rewards, are in their own nature among the number of favorable things, and receive an extensive interpretation. Where they are not too burthensome to the benefactor, goodness, kindness, beneficence, and generosity, are liberal virtues. They do not act in a penurious manner, and know no other bounds than those set by reason.” I will remark, that the burthen does not fall too heavy; before signing the treaty, this burthen was weighed in the scale, and the acre for acre provision was fixed as a counterpoise. Admit to the whole extent, that the promise to the Indian was liberal, who will pretend it was too much so? The man who filled your ranks and fought for you in the hour of trial, as a soldier, asks to retain the spot that contains the remains of his ancestors, agrees to part from his nation, to submit to laws to him as yet unknown and untried; he, with his nation, gives an equivalent in other lands, and enlarges thereby the borders of the white man. Who can pretend, under such circumstances, that a liberality of construction, to sustain the Indian, should not be given?
From a sense of the deepest obligation, I have felt myself constrained to view this case in a very different aspect from that in which it has been viewed by my brother Judge, (Catron.) Convinced that I am not in error, I could not escape from this discharge of duty. Whatever might have been decreed wise by the politician, or whatever most for the advantage of the State, were subjects from which I felt myself discharged. Of one leading feature, I have been constantly minded in this examination; that by a previous treaty this land *333 had been guaranteed to the Cherokee Indians. With this before me, bow could I make their rights to rest alone on the liberality of those with whom they had treated, and therefore bring myself to the conclusion, that a strict construction of the instrument ought to follow? I have shown the fallacy of such an argument, opposed as it is to the law of nations. Even had the right been founded in reward, or stood alone as a gratuity, still the treaty would be entitled to liberality of interpretation. The government of the United States had too much magnanimity to recede from her promise; and she has not done so, for her agent received the registry, and her surveyor set apart the land. Why should I take it upon myself to say the promiser shall not construe her promise equitably and liberally? On the contrary, I should, and do, rejoice at-it. The sordid consideration of gain to the State by a sale of the land for money, whatever it might weigh with the politician, can never find place with the judge. He, subject to weightier responsibilities, and with higher aims in view, will pronounce what he deems to be the law.
2. It must be admitted, that a voluntary abandonment by the Indian, might, under the treaty, have destroyed the right of such as had taken reserves; but the abandonment, to have that effect, must have been of such character as evinced a disposition to remain away from the land, and to depart from the society of the civilized man. While a disposition to return to the land reserved could be reasonably supposed, the State of Tennessee had no right to enter, claiming the land as forfeited. In short, the same liberality of construction that, in my opinion, should be given to the treaty, ought to be applied to the right when acquired, to make that right available. The case is said to involve the rights of the State. For myself, I view it as a case between man and man. While nothing is allowed the Indian, but what, in parallel cases, has been always awarded to the citizen, so neither ®an any thing be withheld which might prejudice the Indi *334 an’s rights. My opinion, from the premises laid down on this point, is, that the head of an Indian family residing east of the Mississippi, on the lands surrendered, or which might be, and who has expressed his desire to become a citizen, by a registry with the.agent for that purpose, is entitled to a reserve. If he has no improvement, he may, with the consent of the agent, select where he will take. If he has an improvement, all agree he may select it; but with the consent of the agent, for reasons to him satisfactory, he may depart from it, and agree upon another place, and this will be no forfeiture of the right; and that abandonment to be effectual, must be proved to be voluntary, and with a mind to depart permanently.
3. On the right of the United States to treat with the Indians, and thereby grant reserves, but little need be said. The sum of the argument is, that theUnited States, by such treaty, meddles with and disposes of the domain of the State. The reason I shall advance, opposed to the above position, will be confined to the lands directly in question. Before Tennessee existed as an independent State, (in 1791,) the treaty of Holston, article seventh, solemnly guaranteed to the Cherokees all their lands not thereby ceded. The lands in question, were not thereby ceded. Subject, therefore, to this warranty, Tennessee was received into the Union, and consequently took her rights subject to this burthen. To obtain the right of domain, an act of the treaty-making power was indispensable to do away the guarantee of the treaty of 1791. None ought to question the purity of the act of negotiation; it was made by a high power, and submitted to the Senate of the United States, where it was ratified. By the guarantee in the treaty of 1791, we were held out from those lands. Who can say,'that to get rid of the guarantee, too great a price was paid? I will not enquire who sustained the burthen of the treaty. Tennessee, if she loses any thing, loses but that part of the land acquired, which the Indians have reserved. This bears proportion to *335 the whole quantity, as three is to one hundred. A resort to force, rather than treaty, which, by-the-by, the enlightened spirit of the age forbids, would have cost us more.
My object has been to lay down rules applicable to the cases before us; when applied to the facts, the effect will be obvious. I am saved the labor of reciting those facts, since in the opinion of Judge Whyte, he has detailed and dwelt upon them, applying the law not inconsistent with this opinion. In the other cases of Grubbs’ lessee vs. M’Clatchey, M’Intosh’s lessee vs. Cleaveland and others, and Morgan’s lessee vs. Fowler, I accord with Judge Whyte in the conclusions he has drawn.