Richardson, Ch. J.,
delivered the opinion of the court:
Under the provisions of the act of March 3,1883 (ch. 141, 22 Stat. L., 585), the claimant brings this action against the United States and the Cherokee Nation to recover a proportional part of two funds held by the United States in trust.
It is necessary to a correct understanding of the case to review the history of the Cherokee Indians, the Cherokee Nation, the Eastern Band of Cherokee Indians, and their relations to each other as well as to the United.States, and to point out how s the funds now in controversy had their origin. We are not aware of a single material fact in controversy. All parties rely upon facts appearing mostly in treaties, laws, and public documents.
As the act referring the case gives jurisdiction in equity as well as atlaw, afinding of facts is not required. (The Hot Springs Cases, 10 C. Cls. R., 289, 433; affirmed on appeal, 92 U. S. R., 698.) But for convenience, and with the consent of the parties, we have set out such facts outside of the public archives as seemed at the argument to have some bearing on the construction of the treaties involved, and have mentioned all the public documents and printed publications referred to by either party, which, although the court above would probably take judicial notice of their contents as we have done, the parties have agreed may be used on appeal without being reprinted in the findings.
The Cherokee Indians prior to the year 1785 had inhabited or roamed over a large territory of land, having no defined boundaries, extending from the Gulf of Mexico to New York, *462 but were dwelling mostly within wliat are now the States of North Carolina, Georgia, Tennessee, and Alabama.
Previously to that year, in 2783, the State of North Carolina had granted to the Oherdkee Indians a tract of land within its borders, to be “ reserved unto the said Cherokee Indians and their nation forever.” This grant was held by the supreme court of North Carolina to convey a fee-simple estate, instead of a mere usufruct conceded by the white race to the aboriginal Indians by right of .occupancy. (Eu-che-lah v. Welch, 3 Hawkes, 154.)
On the 28th of November, 1785, the United States made their first treaty with these Indians, through “ the headmen and warriors of all the Cherokees,” at Hopewell, on theKeowee, by which was “ allotted to the Cherokees for their hunting grounds ” a large tract of land within what are now the States of North Carolina, South Carolina, Alabama, Georgia, and Tennessee, in which were included the lands previously granted to them by the State of North Carolina. (7 Stat. L., 18.)
July 2, 1791 (7 Stat. L., 39), the United States entered into another treaty with the “ chiefs and warriors of the Cherokee Nation, on the part and behalf of the said nation.” The i>riu-cipal features of this treaty are, the readjustment and establishment of the boundary between the United States and the Cherokee Nation, and the agreement of the former to pay annually to the latter the sum $1,000, which was increased to $1,500 by an additional article. (7 Slat. L., 42.)
Here began the annuities, which were all finally commuted by the funding of $214,000 for the benefit of the Cherokee Nation, under article 11 of the treaty of 1835-M0 (7 Stat. L., 483), out of which grows one of the matters here in controversy. Additional annuities were granted for lands ceded, &c., as follows : The treaty of 1794 (7 Stat. L., 43) increased the amount to $5,000; the treaty of 1798 (7 Stat. L., 62), added $1,000; the treaty of 1804 added another $1,000; and the treaty of 1805 (7 Stat. L., 93) granted an addition of $3,000. Thus, in the year 1805 the annuities had reached the sum of $10,000.
This was annually paid to the Cherokee Nation in its organized capacity, as represented by the Cherokee Indians residing within the boundaries of its territory east of the Mississippi liiver, until after the treaties of 1817 and 1819. (7 Stat. L., 156, 195.)
*463 In tbe mean time there were several other treaties made between the parties, adjusting aud curtailing the boundaries of the nation, ceding’ to the United States parts of its lands for cash payments and annuities for limited periods, and making some other provisions not material in this case. (7 Stat. L., 93, 94, 101, 103,139, 148.)
The historical facts which led to the making of the treaties of 1817 and 1819 are matters of considerable importance.
At the time of the first treaty of 1785 there were about fifty Cherokee towns or settlements within the territory confirmed to the Indians. Not many years thereafter the inhabitants of the upper towns, at or near the Smoky Mountain and Blue Ridge, mostly if not wholly in the State of North Carolina, and those of the lower towns, in the valley of the Mississippi, became divided to some extent in their habits and tastes. Those in the upper towns desired to engage in the pursuits of agriculture and civilized life in the country they occupied, and for that purpose they asked for a divisional line between the two classes of towns. Those of the lower towns desired to continue the hunter life, and on account of the scarcity of game where they lived they wished to remove across the Mississippi River and settle on vacant lands of the United States. The President of the United States was appealed to, and on the 9th of January, 1809, he replied to the parties as follows: “ The United States, my children, are the friends of both parties, and, so far as can be reasonably asked, they are willing to satisfy the wishes of both. Those who remain may be assured of our patronage, our aid, and good neighborhood. Those who wish to remove are permitted to send an exploring party to reconnoiter the country on the waters of the Arkansas and White Rivers. * * * When this party shall have found a tract of country suitin g the emigrants, and not claimed by other Indians, we will arrange with them and you the’exchange of that for a just portion of the country they leave, and to a part of which, proportioned to their numbers, they have a right.”
By common consent of the Indians and the approval of the President a divisional line was established along the ridge between the Hiwasse aud Hightower Rivers, on the one side and the other of which the respective parties could reside and there each best preserve the habits of the people. (Senate Hoc. No. 298, first session Twenty-ninth Cong., p. 173, 7 Stat. L., 156.)
*464 A more important result which followed was the emigration, which commenced at once, from the old territory of the Indian nation to the unoccupied lands of the United States on the west side of the Mississippi Itiver, now embraced within the State of Arkansas. This continued regularly until, in the course, of the next following eight years, nearly or quite one-third of all the Cherokees had settled in their new western home in the wilderness.
Those who remained east conducted the affairs of the nation, to which was regularly paid by the United States the annuity of $10,000 heretofore referred to. Of this annuity and of the other common property of the nation east of the Mississippi Elver those who went west had no share or benefit. They lived a hunter’s life on the public domain, but not within any defined boundaries, very much as their ancestors lived in the east before the treaty of 1785. Having increased in numbers and importance, these Western Cherokees desired a cession of land for their exclusive use.
Under such circumstances the treaty of 1817 was entered into. (7 Stat. L., 156.) The parties to it were, first, the United.. States) second, the chiefs, headmen, and warriors of the Cherokee Nation east of the Mississippi Biver; third, the chiefs,, headmen, and warriors of the Cherokees on the Arkansas Biver. Its principal provisions were these: The whole CherokeeNation ceded to the United States certain parts of its lands lying east of the Mississippi. The United States ceded to that part of the Cherokee Nation on the Arkansas as much land on said river and on the White Biver as they received from the Cherokee Nation east, “ acre for acre, as the just proportion due that part of the nation on the Arkansas, agreeably to their numbers.” They agreed to pay for all improvements of real value on the lands ceded- to them by the nation. They further agreed to give a reservation of 640 acres of land to each and every head of any Indian family residing on the east side of the Mississippi Biver, on lands surrendered to the United States, who might wish to become citizens of the United States. They encouraged emigration by promising to give a gun and other articles to each poor warrior who would remove west.
It was further agreed that the annuity should be divided between the two parts of the nation, east and west, agreeably *465 to their number, to be determined by a census taken as therein provided.
The treaties previously made between the United States and the Cherokee Nation were to continue in full force with both parts of the nation.
This was soon followed by the treaty of 1819 (7 Stat. L., 195), the Cherokees on both side of the Mississippi River, east and west, having come together and acknowledged themselves as one nation, by the terms and agreements of the treaty of 1817 entered into by them separately. This treaty of 1819 was made with the “chiefs and headmen of the Cherokee Nation of Indians” as one body-politic. By it the nation makes further cession of lands to the United States from the Indian territory east, “ in full satisfaction of all claims which the United States have on them on account of the cession to a part of their nation who have or may hereafter emigrate to the Arkansas.”
The United States agreed to pay ix»r all improvements on the ceded territory as in the former treaty, and to “ allow a reservation of 640 acres to each head of any Indian family residing within the ceded territory, those enrolled for the Arkansas excepted, who choose to become citizens of the United States in the manner stipulated in said treaty.” Thirty-one persons are also specifically named in article m, and in a list annexed to the treaty, who are to have each a reservation of 640 acres, to be laid out as therein described.
The exact number of those who took reservations under those two treaties does nob appear and is not material to the issues here involved. . But that there were many who did take them is apparent, as the right to do so continued until taken away by the treaty of 1835-’36, the thirteenth article of. which (7 Stat. L., 484) confirmed the title to those reservees whose lands had not been sold by the United States; and some of these titles have been in litigation and upheld by the courts. (Eu-che-la v. Welch, 3 Hawkes, 155, 174; Blair v. Pathkiller, 10 Tenn., 406; Jones v. Evans, 13 Tenn., 323; Ex. Doc. H. of R. No. 104, 1st sess. 20th Cong.)
By the sixth article of the treaty of 1819 it was agreed, apparently to avoid the taking of a census, that the annuity to the Cherokee Nation of $10,000 should be paid two-thirds to the Cherokees east of the Mississippi and one-third to the *466 Cherokees west of that river, as it was estimated that those who had emigrated and who had enrolled for emigration constituted one-third of the whole nation. But this provision was not to take effect if objected to by the Cherokees west before the expiration of one year. No objection was made, and the annuity was thereafter paid in the manner provided by that article until it was funded under the provisions of the treaty of 1835~’36, since which time the net income has been paid to the nation as a body-politic.
Next came the treaty of 1828 (7 Stat. L., 311), which was made exclusively with the ‘'chiefs and headmen of the Cherokee Nation of Indians west of the Mississippi.” Thereby the United States “ agreed to possess the Cherokees, and to guarantee it to them forever, 7,000,000 acres of land,” described by bounds, situated further west, in what is now the Indian Territory. The United States further guaranteed to the Cherokee Nation a perpetual outlet^west, and a free and unmolested use of all the country lying west of the western boundary of the described limits, and as far west as the sovereignty of the United States and their right of soil extended, and further agreed to pay to the Cherokees certain sums of money and the expenses Of removal and the costs of improvements left behind.
The eighth article offered inducements to the Cherokees in the Bast to join their brethren in the West by the agreement on the part of the United States to pay the cost of their emigration, and give to each head of a family a gun and other articles, and to those from Georgia a sum of money in addition.
By the seventh article the Cherokee Nation re-ceded to the United States the land in Arkansas ceded to it by the treaties of 1817 and 1819.
The treaty of 1833 (7 Stat. L., 414) made with the chiefs and headmen of the Cherokee Nation west of the Mississippi did little but readjust the boundaries of their western lands.
It was evidently intended and expected, on the part of the United States government and the white people of North Carolina and Georgia, that all or nearly all of the Indians in those States should remove west. As early as April 24, 1802, the United States had entered into a written agreement with Georgia by which they were to extinguish the Indian title to all the lands within that State, in consideration of the cession of its western lands. (“The Public Domain,” p. 80.) North Car *467 olina also, without having any written agreement to that effect, claimed that the United States were bound in like manner to extinguish the Indian titles to lands within its boundaries on account of a like cession of its western lands. (Doc. H. of R. 71, first session Twenty-third Congress.) But emigration went on slowly, and was little, if any, increased by those treaties.
The white people of Georgia and North Carolina became impatient and often excited at the continuance of the Indians among them, especially in the former State. Severe laws were passed to their detriment and for the purpose of driving them away, among others one in 1830 making it a penal offense for the Cherokees to call a council or legislative assembly in their territory, or to hold such council or assembly, &c. They were persecuted in one way and another until many of those in Georgia fled from their lands and took refuge elsewhere. The acts of oppression are too numerous to mention, but the annals. of history abound in the recital of them. In North Carolina they were not dealt with so harshly, but their removal from that State also was most earnestly desired by the people. (Ex. Doc. H. of R. No. 71, first session Twenty-third Congress.) The case of The Cherokee Nation v. The State of Georgia, 1 Peters, 1, more fully reported in a separate volume by Richard Peters in 1831, where the offensive laws and the complaints of ' the Indians are all set out, shows some of the troubles of the Indians;
On account of the agreement on the part of the United States to extinguish the Indian titles to lands in the States, and the feeling, desire, and earnestness of the white people to get rid of the Indians themselves from the boundaries of their State, it became the fixed, determined, and aggressive policy of the United States government to induce, and in case of necessity to compel, all the Cherokee Indians in the States of Georgia, North Carolina, Alabama, and Tennessee, except those who had become or were to become citizens of those States, to remove and join their brethren in the Indian territory west, and to break up the Indian nation as a body politic in the East. It was with that policy and under those circumstances that the treaty of 1835-’36, called the treaty of New Echota (7 Stat. L., 478), was entered into. To carry out that policy immense sums of money, millions of dollars not promised by treaties, have been appropriated by Congress and paid *468 in the spirit of unbounded liberality, yielding to the demands of the Indians in almost every case, perhaps in every case without exception, and paying in one way and another to an extent more than twice as much as they agreed to pay by the terms of the treaties, as is shown by the numerous appropriation acts scattered through the Statutes at Large.
' The first step in that direction was an effort to negotiate with the Cherokee Nation for the purchase of its territory in the States and for the removal of all the Indians to the territory ceded to those in the West. In 1835 the question of purchase was before the Senate, and a resolution was adopted ■declaring $5,000,000 a fair price to be paid for the lands. Dissensions, however, arose among the Indians themselves in relation to the sale of lands and their own removal. One party, headed by John Boss, the principal chief, with whom were a very large majority of his people, who were willing to sell their common lands if a sufficiently large price could be obtained, with the privilege of remaining east on lands to be purchased by them, were earnestly opposed to removal west on any terms. The other party, composed of a comparatively small number of persons, were disposed to go west and were willing to sell the lands at the Senate’s price.
Delegations went to Washington. The terms of a treaty/ were proposed by officers of the United States after much discussion, but they failed to satisfy the Boss party, who became bitterly opposed to their adoption.
The propositions for a treaty thus prepared were taken to the Cherokee country, and, upon notice given by the United States commissioners, the people of the nation were convened at New Echota, in Georgia, December 21 or 22, 1835, to take them into consideration. A council was organized by the choice of a presiding officer and secretary. Most if not all of the Boss party abstained from attendance. The next day the council received the propositions of the commissioners, who ■explained them in both the English and Cherokee languages.
A committee of twenty Indians was appointed to examine and report upon the same. On the 28th of December, 1835, this committee reported some matters of difference and how they might be remedied. It was then resolved that the committee of twenty be authorized to conclude the treaty and to sign the same in behalf of the Cherokee Nation, and this they *469 did the next day, December 29, 1835. (Doc. H. of R. 286, 1st session 24th Cong., p. 112.)
The treaty was laid before the Senate for ratification at once. Its ratification was actively opposed by Ross and his party. The friends of the measure among the Indians, as well as the administration, desired some changes, and March 1 supplementary articles were agreed upon and signed. The treaty and the supplementary articles were then ratified together by the Senate, and were proclaimed by the President May 23, 1836. (7 Stat. L., 478, 488.)
By this New Echota treaty, among other provisions, the Cherokee Nation ceded, relinquished, and conveyed to the United States all the lands owned, claimed, or possessed by them east of the Mississippi River, for the sum of $5,000,000, &e. (article 1), and the Cherokees agreed that they would remove to their new homes in the Indian territory ceded to the Cherokees west within two years from the ratification of the treaty (article 16), subject to the provision that those individuals and families of the Cherokee Nation that were averse to a removal to the Cherokee country west of the Mississippi, and were desirous to become citizens of the States where they resided, and such as were qualified to take care of themselves and their property, should be entitled to receive their due proportion of all the personal benefits accruing under the treaty for their claims, improvements, and per capita.
On the part of the United States, after reciting the cession of the 7,000,000 acres of western lands to the Western Cherokees by the treaties of 1828 and 1833, described by boundaries, it was agreed to “ guarantee to the Cherokee Nation a perpetual outlet west, and a free and unmolested use of all the country west of the western boundary of said 7,000,000 acres, as far west as the sovereignty of the United States soil extends”; and it being “apprehended by the Cherokees that in the above cession there is not contained a sufficient quantity of land for the accommodation of the whole nation on their removal west,” the United States agreed to convey to said Indians and their descendants, by patent, another adjoining tract of800,000 acres; and the whole was afterwards so conveyed to the nation as a body politic (article 3), by a patent duly issued.
The United States further agreed to pay $5,000,000 for the lands ceded to them, and after deducting out of that sum the *470 amount expended for the improvements, former claims for spoliation, removal, subsistence, and other matters which were to be paid by the United States, they agreed that the balance should be divided equally between all the people belonging to the Cherokee Nation east and such Cherokees as had removed west since June, 1833 (article 15). Thus arose the per capita money about which there Was much controversy afterwards, as there was about the removal and subsistence money, $53.33 to each person, promised by article 8.
There is no controversy now about the per capita money nor about the removal and subsistence money, and their only importance in this case is in explanation of the terms of the subsequent treaty of 1846, which are involved in the present issues.
The eleventh article provided that “the Cherokee Nation of Indians, believing it will be for the interest of their people to have all their funds and annuities under their own direction and future disposition, hereby agree to commute their permanent annuity of $10,000 to the sum of $214,000, the same to be invested by the President of the United States as a part of the general fund of the nation.”
Of the two claims referred to this court and' set out in the petition, one is founded on this article of the treaty. The present claimant band seeks to recover such a share of chis commutation fund, and the interest thereon ever since it was invested by the United States, as will be in proportion to the number •of its members as compared with the citizens of the Cherokee Nation who live west on the common lands; all the income having been paid to the Cherokee Nation as a body politic, and none to the claimant.
The other claim is to the same proportional share of the money received from sales of portions of the common lands ceded to the nation by the United States, which money has been funded and held in trust according to the terms of agreements between the United States and the Cherokee Nation, and the income whereof and part of the principal have been paid to or for the benefit of the Cherokee Nation as a body politic, and none to the claimant.
While this treaty was before the Senate for ratification there appeared at Washington one William H. Thomas, from North Carolina. He was the agent and held a power of attorney to act for most of sixty heads of families, composed of about 333 *471 persons, who claimed to be citizens of North Carolina, either as reservees under former treaties or otherwise, and who intended to remain such and did not wish to remove west. That such was their character is manifest from the public documents. (Ex. Doc. 120, 2d session 25th Cong., pp. 610, 612, 616; Ex. Doc. No. 408, 29th Cong., 1st session, p. 17.) He does not seem to have been given any consideration by the treaty-making power nor by the authorities at Washington. But three days after the treaty was promulgated he succeeded in having a written document signed by a portion of the Cherokee Indians east who signfcd the treaty, and two persons who claimed to represent the Cherokees west, and which he himself signed, purporting to settle some construction to be given to the treaty. That document he filed in the Indian Office, July 4, 1836. (Doc. 120, 2d session 25th Cong., p. 610.)
We do not regard that agreement as entitled to any weight in the present case, for several reasons. The signers of it were never authorized, either by the Cherokee Nation or by the Western Oherokees, to make any such negotiation or agreement. It was never acknowledged or ratified by either branch of the nation. Any defects in the authority to make the treaty itself, if there were such, have been cured by its ratification in subsequent treaties, but it is not so with this paper. The Attorney-General in 1845 advised that it was “ not admissible to establish a construction of the treaty inconsistent with its own provisions and unauthorized by its language.” (4 Opin., 441.)
The meaning of the paper is, in some respects, obscure, much more so than in that of the treaty which it purports to explain, and the contemporaneous construction given to it by Mr. Thomas himself wholly excludes the present claims. (Doc. 298, 1st session 29th Cong., and Doc. 408, 1st session 29th Cong.) By that construction it would seem that the persons represented by Thomas have received all that it purported to concede to them, and all that they ever claimed until after the organization of the present band, more than thirty years later, as far as we have been able to discover from any documents referred to. We shall have occasion to consider this matter more fully in connection with the treaty of 1846.
Immediately upon the ratification of this treaty steps were taken to execute its provisions. Commissioners were appointed to adjust the claims for improvements, &c., but emigration *472 went on as slowly as before. Ross and his party were now as ' violently opposed to the execution of the treaty as they had been to its ratification. They denounced it as made without authority of the nation, and as void and of no binding effect upon them. So large a number' shared those feelings that at the end of the two years assigned for removal only about 2,500 out of 17,000 or 18,000 had gone west.
The authorities at Washington, in 1838, took the matter in hand, with the determination to enforce, by whatever means might be necessary, what had all along been known to be the paramount object of the treaty on the part of the United States— the removal west of the whole Cherokee Indians,’except such as were, or were to become, citizens of the States. In this they were supported by the white people of the States where the Indians resided. Lieutenant-General Scott was sent south with a few regular troops, to which were added volunteer companies from each of the States interested. He was instructed to-remove all Indians except those who were entitled to remain under the 12th article as citizens. (Scott Autobiography, vol. 1, page 317.) When he had assembled his troops among and around the Indians their formidable number indicated to the latter that further resistance was useless, aud that they must go west either peaceablyor by force. Ross yielded to the force of circumstances and the necessities of the case, but not until after some arrangement had been made with him by which a very large sum of money was to be paid to him, as it was afterwards paid, for his assistance and expenses in the removal.
The removal was begun in earnest. The Indians were gathered together at camping grounds preparatory to removal. The country was scoured for runaways and those who concealed themselves, and none were allowed to escape except those who were to become citizens under the 12th article. They were soon sent west under military guard' and put upon the Western Cherokee land.
So complete was the removal of the nation' and of all who intended to remain its subjects that those who went took with them their ancient organization, constitution, and laws, and set them up in their new home without a change of chief, headmen,, or rulers. This their council, at Aquokia Camp, oil the 1st of August, 1838, resolved upon, “ after,” as John Ross expressed it, “ the seizure and captivity of the whole Cherokee people *473 east by tbe military power of tbe United States government.” This resolution was also reaffirmed immediately upon their arrival west.
Tbe whole number thus removed was between sixteen and seventeen thousand, leaving behind between eleven and twelve hundred to become citizens under the 12th article. These last were without an organization and without a collective name. They ceased to constitute the Cherokee Nation and they were not called the Eastern Cherokees. That name followed those who removed, and for a long time was applied to those who involuntary went west after the treaty of 1835, in order to distinguish them from the “ Old Settlers,” who had gone at earlier dates.
The fact that those who remained were Cherokee Indians by blood and race could not be blotted out, and they were so called, but their connection with the Cherokee Nation was completely severed.
They had no further voice in its councils nor in its affairs. They were not subject to its laws and they owed to it no allegiance. The Cherokee Nation, as a body politic, never afterwards recognized them as part of the nation in any form or manner whatever. The only privilege ever accorded to them by the' nation was that they might become citizens and subjects upon removal within its territorial boundaries, and they accord that to all those who are Cherokees by blood or race, wherever they may come from.
They had expatriated themselves from the Cherokee Nation, and had become denizens and subjects, if not citizens,- of the States where they resided. Thomas, their agent and attorney, wrote that by the constitution and laws of the State they had the right to vote, though they seldom exercised it, lest by identifying themselves with one political party they should give offense to the other. (Ex. Doc. No. 298, 1st session 29th Congress, p. 181.) Whatever organizations they subsequently effected must have been mere social organizations, with no power, as an independent nation of their own, to make laws or do other national acts. That follows from their relations to the State of North Carolina.
They were never afterwards recognized by the United States as any part of the Cherokee Nation, as a body politic.
As soon as the Eastern Cherokees reached their new home *474 in the "West new dissensions and troubles arose. The new comers were double the number of the “ Old Settlers.” They set up their own ancient government, and endeavored to make the “ Old Settlers ” submit to their rule. Against this the “ Old Settlers ” rebelled by resisting the domination of the intruders, as they regarded them, as far as they were able to do. The “ Old Settlers ” hadan organization of their own, and while they had been willing to receive emigrants in small numbers from time to time, emigrants who came in and joined their existing organization, they thought it unjust to turn in upon them a body double their number, to occupy their common lands without remuneration, and to subvert their organization.
Those of the Eastern Cherokees who signed the treaty or who favored it were obnoxious to the other Eastern Cherokees who had opposed it. Their leaders were' murdered and they were persecuted. Naturally they sided with the “ Old Settlers ” against the Eastern Cherokees, but the latter were numerically too strong for both of their opponents. The situation of affairs became intolerable to the minority. Discord, disorder, murder, and persecution reduced the whole people to a deplorable condition.
Matters went on in this way until 1845, when each of the three parties sent delegates to Washington with the view of bringing their affairs to a settlement. The “Old Settlers” and the treaty party wanted to divide the territory and the people into two nations. There were other demands to be made on the United States by each of these three parties on account of the terms of the treaty of 1835-36, and the payments made, and to be made, thereunder.
Commissioners had been appointed by the United States to settle the claims for improvements and for other matters connected with the territory ceded to them on the east of the Mississippi River. A large amount of money had been paid out, and much of it had been misappropriated; On account of the construction given by them to the treaty, nearly all of the $5,000,000 purchase-money had been expended, and no per cap-ita money had been paid, and there was no means left for paying it.
These were the circumstances which led to the treaty of 1846. (9 Stat. L., 871.) The delegates of the respective parties were in Washington at the same time, and there presented to the *475 Executive and the Senate their respective grievances, claims, and demands, in two lengthy written documents. These documents, with two from William H. Thomas, of North Carolina, afford much light upon the true meaning and construction of the treaty.
Thomas had been, as we have seen, the agent of some sixty heads of families to prosecute their claims under the treaty of 1835-’36, and had obtained a written paper from some of the delegates who signed that treaty, as to its construction. He now appears at Washington and presents a written “ argument in support of the claims of the North Carolina Cherokee Indians,” as their attorney. (Ex. Doc. H. of B., 1st session 29th Cong., No. 298, p. 171.) Therein he states exactly what their claims are, and it is significant that he not only does not set up either of the claims now in controversy, but he specifies that very commutation fund of $214,000 as having been “ transferred west for the use of the whole Cherokee people west of the Mississippi as a national fund,” and to that he made no objection, referring to it only as an argument why his other claims should be allowed. He claimed for his clients only the per capita money and the removal and subsistence money, under articles eight and twelve of the treaty.
Again, on the 16th of June, 1846, he sent to the Senate a memorial, accompanied by the written agreement signed by the delegates who made the treaty of 1835-’36, and other documents in support of the claims of the North Carolina Indians, with another long argument which he had submitted to the Commissioner of Indian Affairs in March previous. Here also no claim whatever is made either to any part of the permanent fund of $214,000, under the eleventh article of the treaty, or to any share of the common lands west. (Ex. Doc. Senate, 29th Cong., 1st session, No. 408.) In one of the letters to him from William Rogers, which he presents in support of the claims, the vested funds are specially excepted from the claim. (Page 6.) Thomas himself therein says of his clients: “ Regarding themselves as permanently settled under the protection of the laws of North Carolina, provision having been made for the removal of such individuals as might become dissatisfied with the country east and desire again to pursue the hunter life in the West, they did not expect or desire any more to be annoyed with enrolling agents; and in anticipation of remain *476 ing permanently as a community on the lands they had purchased, and only occupy the lands which might he assigned them west as they chose to go, they had felled the timber, cleared lands, &c.” From this it is clear that they did not consider that the treaty gave them any interest in the western lands except such as might be assigned to them as they chose to go there. (Ex. Doc. Senate,' 1st session 29th Cong., No. 29B, p. 298.)
Thus were presented to the treaty-making power, when negotiations for the treaty of 1846 were going on at Washington, the exact claims and all the claims made by the Cherokees east-. That treaty was made on the one side by the United States, and on the other side by delegates of those parties constituting the Cherokee Nation — first, “theregular constituted authorities of the Cherokee Nation”; second, the “treaty party”; and, third, “the Western Cherokees,or Old Settlers.” It will be seen that the North Carolina Cherokees were not made parties to this treaty, and it is evident that they were not regarded by the treaty-making power as forming any part of the Cherokee Nation.
The treaty secures the lands occupied by the Cherokee Nation to the “ whole Cherokee people, for their common use and benefit,” and requires a patent to be issued for the same. Such a patent had been issued to the Cherokee Nation, as a body-politic, December 31,1839.
It provided that all difficulties between the several parties of the Cherokee Nation should be and were settled and adjusted. A general amnesty was declared and all the contending parties were united in amity and friendship and in political rights. The money claims against the United States were adjusted, a division of the per capita money provided for, and each of the three parties of the Cherokee Nation were allowed their respective rights and claims as therein set out. These are not now in controversy.
The union of the whole Cherokee Nation, that is, the three divisions of the people mentioned in the treaty, had been consummated in 1839 by “An act of union between the Eastern and Western Cherokees,” and the constitution under which they have always since lived as one nation. The Cherokees in North Carolina have never rejoined the nation, but have con- *477 tinned to live outside of its boundaries, its institutions, and its laws.
The tenth article of the treaty of 1846, which is much relied upon by the claimant in this case, is as follows: “ It is expressly agreed that nothing in the foregoing treaty contained shall be so construed as in any manner to take away or abridge any rights or claims which the Cherokees now residing in the States east of the Mississippi River had, or may have, under the treaty of 1835 and the supplement thereto.”
As the Cherokees here referred to were before the Executive and Senate, by their agent and attorney, with the written statement of their rights and claims, and as they did not then present the claims now in controversy, but did present claims for the per capita monéy, noneof which they had received, and for the removal and subsistence money, their right to which had been denied to them, in accordance with the opinion of the Attorney-General in 1845 (4 Opin., 435), it amounts almost to demonstration that this article of the treaty had no reference to the matter involved in the present claims, but was inserted to satisfy the Cherokees in North Carolina that the claims which they had presented should not be taken away or abridged.
Thus we have a contemporaneous construction by all parties concerned of the meaning of the treaty of 1835-’36, which excludes the present claims, and that construction is confirmed by the action of all parties after the treaty of 1846. TheUnit-ed States issued the patent for the western lands to the Cherokee Nation as a body-politic, and Congress passed acts by which was paid to every Cherokee Indian in the East his proportion of the per capita money, and they funded an amount of money equal to the removal and subsistence allowances for each of such Indians, paid the interest to them regularly, and the principal sum of $53.33 to each one who subsequently went west until after 1852 (act of 1848, July 29, secs. 4, 5, 9 Stat. L., 264), and the balance of principal is held in trust, as will be hereinafer explained.
These settlements with the Indians in North Carolina, so far as the documents show, appear to have entirely satisfied all the claims ever made by Thomas or any of the Eastern Indians until after the present organization of the Eastern Band, now claimant in this case, and long after all those who took part in *478 the negotiation of the treaty of 1835-’36, or who were then immediately affected by it, must be presumed to have died.
Had any such claims as are now put forth existed when the treaty of 1846 was made, it cannot be supposed that they would have been omitted from that treaty. Had anybody claimed that the Indians in North Carolina were entitled to a division of the annuity fund created by the 11th article of the treaty of 1835, so important an element of contention, it must be presumed, would not have been passed over; but if the parties intended any such division, their rights would have been set up and settled then and there. Instead of that the income was permitted, without objection, so far as we can discover, to be paid to the Cherokee Nation, as a body-politic, during the lifetime of the parties concerned in the treaty at its inception.
The claimant relies much upon the language of the first article of the treaty of 1846, securing the lands west to the “ whole Cherokee people, for their common use and benefit,” as giving the North Carolina Cherokees and the claimant band an interest therein whenever any part should be sold. Even independently of the contemporaneous construction by all parties, which strengthens our views, we have no doubt that the “whole Cherokee people” there referred to were the three parties into which the Cherokee Nation was then divided by dissensions, and not by locality — -first, the “Eastern Cherokees,” meaning those who removed west after the treaty of 1835-’36, and who constituted the governing party, or, as their delegates signed themselves, the. “ government party ”; second, the “ treaty j>arty,” and, third, the “ Old Settlers,” all mentioned in that treaty.
If, however, the whole “ Cherokee people ” there mentioned included the North Carolina Cherokees, the very language repels the idea of any partition between them. To enjoy the benefit of the common lands they must go and enjoy the same with their brethren, according to the customs, laws, and usages of the nation. There is not a single word in either of the treaties that implies a partition of lands or a division of the funds of the Cherokee Nation. All is distinctly either declared or implied to be “in common.” In clear violation of the idea of common property, the present claimant is seeking a division of it.
Two other treaties have been made with the Cherokee Na *479 tion, in neither of which are the Cherokees remaining east provided for or noticed. The treaties of 1866 (14 Stat. L., 799) and 1868 (16 Stat. L., 727) relate principally to the internal government of the nation, authorize the settlement of friendly Indians on their lands by paying for such right and obtaining the consent of the Cherokee council, cede certain lands to the United States in trust for sale, and provide for the investment and disposition of the funds arising from the sales, all for the benefit of the Cherokee Nation as a body politic. It is out of sales under these treaties that the land fund now in controversy arises.
We will now return to the Cherokee Indians in North Carolina. Up to 1856, as we have shown, they individually, not as a tribe or band or other organization, had received the interest on $53.33 each, funded for their removal and subsistence west when any of them should go there. The act of 1855 contemplated paying out the whole principal, but that object was never consummated. The act of 1868 (15 Stat. L., 228) provides for taking a new roll or census of North Carolina Indians, upon which payments should be made. It also provided that the Commissioner of Indian Affairs should take the same charge of the North Carolina Indians as of other tribes of Indians.
This money finally, in 1875 and 1876, passed into the trust fund held by the United States for the benefit of the Eastern Band. (Act of March 3,1875,18 Stat., 447 ; act of August 15,1876,19 Stat., 197.)
This Eastern Band was organized at the suggestion of an officer from the Indian Office, after 1868, for the purpose of enabling the Indians in North Carolina and vicinity to transact business with the government. It is not a nation of itself, and has no connection with the Cherokee Nation, and has never been recognized by the United States or by that nation in any treaty as so connected. It has no power to make laws, its members being all subject to the laws of the States where they live. At most it can be but a social organization, a little more developed than anything of the kind which had existed there before since the nation went west in 1838, fostered and encouraged by the United States in some matters, but not recognized as a nation in whole or in part. This is manifest from the articles of its constitution, set out in the findings, and from the statute provisions in relation to investments held in trust by the United States for *480 their benefit and otherwise. (18 Stat. L., 447; 19 Stat. L., 197, 291.)
It is not the successor of any organization known to the laws or treaties of the United States, and as a band it has none of the individual rights or claims of those to whom money was promised under the treaty of 1835-’36, nor to any grants of Congress, except' such as have been gratuitously given to it. The individual claimants under the treaty of 1835-’36 have probably all died, and if any of their claims were not settled before their deaths, such claims do not pass to the Eastern Band, but belong to their legal representatives. Whether that be so or not is immaterial, as the claimant band is now seeking to recover not individual property, but a divided share of the common property of the nation.
No treaty was ever made with this band nor with the people composing its membership. All the connection the band has with the United States is such as has been created by the laws of Congress, which may be altered by the same power that enacted them; and Congress can make no laws in relation to the band which are in conflict with the laws and constitution of the State of North Carolina, to which these Indians are subject. \
The status of the Cherokee Nation, one of the defendants, is entirely different. It has its territorial possession and boundaries, its constitution (very much like the Constitution of the United States), its laws, its executive, legislative, and judicial departments, with none of which can any State or the United States interfere.
Its relations to the United States are fixed by contracts, set out in treaties and laws, to which, as a-nation, it has given its assent. The United States, by the terms of those contracts, have become trustee of its funds, which they have agreed to administer according to the provisions of those contracts. As late as January, 1885, in a communication to the Senate, the Secretary of the Interior stated, what has always been understood, that “ the department has not considered it the duty of the Commissioner of Indian Affairs or the Secretary of the Interior to interfere with the affairs of the Cherokee Nation, except in the case especially provided for by treaty with that nation.” (Éx. Doc. No. 17, 48th Cong., p. 6.)
The Revised Statutes, section 2097, enact, what would be the *481 law without the enactment, that “ no funds belonging to any Indian tribe with which treaty relations exist shall be applied in any manner not authorized by such treaty or by express provisions of law.” And in several instances where the funds of this nation, or the money appropriated therefor, have been misapplied by the officers of the United States, through wrong ■construction of treaty provisions or otherwise, Congress has made appropriation for the restoration of the same out of the public Treasury.
The Cherokee Nation has a right to stand upon the contracts of its treaties in relation to the funds now in question, and no acts of Congress and no proceedings of the jjolitical departments of the government in connection therewith can take away its vested rights guaranteed by such treaties.
On the part of the claimant, the Eastern Band, it is alleged that its members being descendants of the ancient Cherokees, they are a part of the Cherokee Nation, and thus entitled to share in its common property, and upon this assumption its claims are principally founded.
If that were so their ease would be in no better condition, but rather worse. If they are part of the Cherokee Nation they are subject to its constitution and laws, and must take and enjoy the rights and benefits of the nation, its property, and its privileges, precisely as other citizens or members enjoy them, and not otherwise.
As early as May 6, 1817, when the national organization existed where now mostly reside the members of the claimant band, whose ancestors were acknowledged as part of the nation, it was resolved by its council that u the authority and claim of our common property shall cease with the person or persons who shall think proper to remove themselves without the limits of the Cherokee Nation.” (Laws of Cherokee Nation, edition of 1852, p. 5.) This was understood to be common law of all Indian tribes and nations, and only reaffirmed by this enactment. While a large number of the nation, as it then existed, were living on Arkansas public lands, they received no share of the annuities and common funds of the nation until the nation consented, b,y the treaty of 1817, to a division with them, and even then they did not receive any of the past annunities which since their removal had been paid *482 wholly to those of the nation who remained, in accordance with their ancient rules and traditions.
In 1825 it was resolved by the national council that “the lands within the sovereign limits of the Cherokee Nation, as defined by treaties, are, and shall be, the common property of the nation.” (Laws, &c., p. 45.)
By the constitution of 1827, made at New Echota, where was signed the treaty of 1835, it was declared that “the sovereignty and jurisdiction of this government shall extend over the country within the boundaries above described, and the lands therein are, and shall remain, the common property of the nation: * * * Provided, * * * That whenever any of such citizen or citizens shall remove, with their effects, out of the limits of this nation, and become citizens of any other government, all their rights and privileges as citizens of this nation shall cease.” (Laws, &c., p. 119.) Again, in the “ act of union between the Eastern and Western Oherokees,” signed by the president of the Eastern Oherokees, the president of the Western Oherokees, and by delegates and officers of each division, July 12,1839, it was declared that “all rights and title to public Cherokee lands on the east or west of the river Mississippi, with all other public interests which may have vested in either branch of the Cherokee family, whether inherited from our fathers or derived from any other source, shall henceforth vest entire and unimpaired in the Gherolcee Nation, as constituted by this union.” (Same volume of laws, &c., A. D. 1852, part 2, p. 1.)
The constitution which followed the above declaration of union provides, in article 1, section 2: “The lands of the Cherokee Nation shall remain common property. Whenever any citizen shall remove, with his effects, out of the limits of this nation, and become a citizen of any other government, all Ms rights a/nd privileges as a citizen of this nation shall cease: Provided, nevertheless, That the national council shall have power to readmit, by law, to all the rights of citizenship, any person or persons who may, at anytime, desire to return to the nation, on memorializing the national council for such readmission.” ■ (Same vol., part 2, pp. 5, 6.)
The demands of the present Eastern Band of Oherokees and its members are in conflict with these express provisions of the constitution and laws of the Cherokee Nation, to which they *483 are claiming to belong. They are demanding a division of trust funds which the United States hold as the common property, and that, too, while they are living without the limits of the nation and are to all intents and purposes citizens of another government, in utter disregard of the traditions, constitution, and laws of the Cherokee people.
Throughout this opionin we have treated the proceeds of the sale of the common lands as the common property of the nation, precisely as were the lands before such sale. Those proceeds have been invested, and the income of the investments is paid out, in accordance with the terms of the treaty of 1866 (14 Stat. L., 805), for the benefit of the Cherokee Nation as a body politic.
If the Indians east of the Mississippi Elver wish to enjoy the common benefits of the common property of the nation, in whatever form it may be, whether in permanentjEund or in the proceeds of the sale of common lands, they must comply with its constitution and laws and become readmitted to citizenship as therein provided. They cannot have a divided share of the common property of the nation, and thus gain rights and privileges not accorded to any other Cherokee Indians — the living out of national territory, avoiding subjecting themselves to the laws of the nation, dividing its common fund and common property, and managing their affairs wholly independent of national authority. Such an admission of right might break the nation into innumerable bands and scatter into fractions funds which, by treaties with the United States and by the constitutions and laws of the Indians themselves, have been dedicated as common funds to the common and not divided benefit of the nation.
In our opinion the Eastern Band of Cherokee Indians, claimants in this case, have no rights in law or in equity in and to the moneys, stocks, and bonds held by the United States in trust for the Cherokees, arising out of the sales of lands lying west of the Mississippi Eiver, nor in and to a certain other fund, commonly called the permanent annuity fund, mentioned in the act of March 3, 1883 (22 Stat. L., 585), referring the case to this court; and a decree will be entered to that effect.